Grady Leroy HODGE, Appellant

v.

The STATE of Texas, Appellee

NO. 03-15-00418-CR, NO. 03-15-00419-CR

Court of Appeals of Texas,
Austin.

Filed: August 4, 2016

Angela Moore, San Antonio, TX, for Appellant.

Gary W. Bunyard, Assistant District Attorney, Llano, TX, for Appellee.

Before Justices Puryear, Pemberton, and Field

## OPINION

David Puryear, Justice

In cause number 41288, Grady Leroy Hodge was charged with twelve counts of aggravated sexual assault of a child who was under the age of fourteen and with three counts of indecency with a child by contact, and in cause number 41289, Hodge was charged with four counts of aggravated sexual assault of a child who was under the age of fourteen and with three counts of indecency with a child by contact.[1] *See* Tex. Penal Code §§ 21.11(a)(1), (d) (providing that person commits offense of indecency with child if person "engages in sexual contact with the child or causes the child to engage in sexual contact" and specifying that offense is second-degree felony), 22.021(a), (e) (stating, among other things, that person commits offense if victim is under age of fourteen at time of offense and if person "intentionally or knowingly" penetrates

---

1. Originally, in cause number 41289, the State alleged additional offenses, but the State later abandoned those counts.

anus, mouth, or sexual organ of child or causes sexual organ of child to contact sexual organ or mouth of person and explaining that offense is first-degree felony). The offenses were alleged to have occurred in 2005 and 2006. The victims were Hodge's daughters A.H. and B.H.[2] During the time relevant to this appeal, B.H. was between six and eight years old, and A.H. was between eleven and thirteen years old. After being charged with the offenses, Hodge moved to sever the two causes. *See id.* § 3.04 (outlining circumstances in which defendant may obtain severance). The district court denied that request, and the two causes were tried together before a jury. At the end of the guilt-or-innocence phase of the trial, the jury found Hodge guilty on all of the counts in both causes. At the conclusion of the punishment phase of the trial, the jury recommended that Hodge be sentenced to 99 years' imprisonment for each count of aggravated sexual assault and to 20 years' imprisonment for each count of indecency with a child, *see id.* §§ 12.32 (setting out permissible punishment range for first-degree felony), .33 (listing available punishments for second-degree felony), and the district court entered its judgments of conviction in accordance with the jury's verdicts. In two issues on appeal, Hodge contends that the district court erred by failing to grant his motion to sever and by failing to provide a unanimity instruction in the jury charge. We will affirm the district court's judgments of conviction.

## BACKGROUND

As set out above, Hodge was charged with multiple counts of aggravated sexual assault and indecency with a child in two separate causes. The indictments alleged that all of the offenses occurred in Burnet County and further alleged, as follows, that Hodge intentionally or knowingly:

**Cause number 41288**

*Aggravated Sexual Assault*

Count 1: penetrated A.H.'s anus with his sexual organ on or about July 1, 2005.

Count 2: penetrated A.H.'s mouth with his sexual organ on or about October 1, 2005.

Count 3: penetrated A.H.'s sexual organ with his finger on or about October 1, 2005.

Count 4: caused A.H.'s sexual organ to contact his mouth on or about June 1, 2006.

Count 5: caused A.H.'s sexual organ to contact his mouth on or about June 1, 2006.

Count 6: penetrated A.H.'s sexual organ with his finger on or about June 1, 2006.

Count 7: caused A.H.'s sexual organ to contact his sexual organ on or about June 30, 2006.

Count 8: caused A.H.'s sexual organ to contact his mouth on or about June 30th, 2006.

Count 9: penetrated A.H.'s sexual organ with his finger on or about June 30, 2006.

Count 10: caused A.H.'s sexual organ to contact his sexual organ on or about July 30, 2006.

Count 11: caused A.H.'s sexual organ to contact his mouth on or about July 30, 2006.

Count 12: penetrated A.H.'s sexual organ with his finger on or about July 30, 2006.

*Indecency With a Child*

---

**2.** During the trial proceedings, the victim in cause number 41288 was given the pseudonym Burnet County Doe 2012-09, and the victim in cause number 41289 was given the pseudonym Burnet County Doe 2012-10. For ease of reading, we will refer to the victims from cause numbers 41288 and 41289 as A.H. and B.H., respectively.

Count 13: caused A.H. to touch the genitals or breasts of B.H. on or about June 1, 2006, with the intent to arouse or gratify his sexual desire.

Count 14: caused A.H. to touch the genitals or breasts of B.H. on or about June 30, 2006, with the intent to arouse or gratify his sexual desire.

Count 15: caused A.H. to touch the genitals or breasts of B.H. on or about July 30, 2006, with the intent to arouse or gratify his sexual desire.

**Cause 41289**

*Aggravated Sexual Assault*

Count 1: penetrated B.H.'s anus with his sexual organ on or about July 1, 2005.

Count 3: penetrated B.H.'s sexual organ with his finger on or about June 1, 2006.

Count 5: penetrated B.H.'s sexual organ with his finger on or about June 30, 2006.

Count 7: penetrated B.H.'s sexual organ with his finger on or about July 30, 2006.

*Indecency With a Child*

Count 8: caused B.H. to touch the genitals or breasts of A.H. with the intent to arouse or gratify his sexual desire on or about June 1, 2006.

Count 9: caused B.H. to touch the genitals or breasts of A.H. with the intent to arouse or gratify his sexual desire on or about June 30, 2006.

Count 10: caused B.H. to touch the genitals or breasts of A.H. with the intent to arouse or gratify his sexual desire on or about July 30, 2006.

During the time relevant to this appeal, Hodge lived in Lampasas County with his wife and his two daughters. Hodge's wife, Donna Hodge, is the biological mother of B.H. but not A.H. Although there was

testimony alleging that Hodge committed offenses at his home, the offenses listed above all allegedly occurred in Burnet County at Hodge's place of employment, Lindsey Materials, when Hodge would take his daughters, either separately or together, to the business on the weekends or other times when the business was closed. According to the testimony from his daughters, there were several places on the property that Hodge would take them to, and they referred to the various areas by different names. A.H. referred to the whole general area as the quarry and referred to two particular spots as the swimming hole and the tunnel. In contrast, B.H. referred to what A.H. called the swimming hole as the quarry and referred to what A.H. called the tunnel as the manhole. For ease of reading we will refer to the quarry when discussing the area generally and will refer to the two particular spots as the tunnel and the swimming hole.

In her testimony, A.H. related that she went to live with Hodge, her sister B.H., and Donna in May 2005 and that she moved out in May 2007. When discussing the offenses that allegedly occurred at Lindsey Materials, she related that Hodge started taking her to his workplace on weekends when no one was there and that the misconduct occurred in 2005 and 2006.[3] Regarding one event that occurred at the tunnel, she explained that he placed her on a conveyor belt, pulled her pants down, forced her to get on her knees, shoved her head against a machine, "put his penis in my butt," and proceeded to have anal intercourse with her. In her testimony, she confirmed that Hodge's penis went inside her anus and that this was the only time

---

**3.** When testifying, A.H. revealed that watching crime television shows would trigger memories of the past abuse and that she would have nightmares about those acts of abuse.

that Hodge anally penetrated her.[4] Further, she related that on other occasions at the tunnel Hodge groped her breasts and touched her buttocks.

After discussing events occurring at the tunnel, A.H. recalled that on other days, Hodge would take her to his work; tell her that he was going to teach her to drive some of the equipment there; pull down her pants; lift her shirt; use his fingers to touch her vagina, breasts, and buttocks; and penetrate her vagina with his fingers. Regarding the penetration of her vagina, A.H. stated that it happened on more than three occasions, but she did not provide any particular details regarding the other occasions other than to state that he repeated that behavior.

Next, she testified that on more than ten occasions, Hodge abused her at the swimming hole. Specifically, she stated that he would tell her that they were going to go swimming and tell her to take her clothes off and that after she took her clothes off, he would start licking her vagina. When describing how many times his mouth touched her vagina, A.H. stated that it happened more than five times but did not provide any distinguishing details regarding those other times. Furthermore, A.H. testified that on at least two occasions while she was in the water, he would take off his clothes and place "his penis between my butt" and touch her "vagina with his penis."

Then, A.H. explained that in another building on the property where Hodge worked, he inserted his fingers into her vagina, groped her breasts, and forced her

to perform oral sex on him after putting his penis into her mouth.

Finally, in addition to describing the conduct that occurred between her and Hodge, A.H. also recalled that Hodge would sometimes take her and B.H. to the swimming hole and would make the two girls "kiss each other" by pushing their heads together and would make the two girls touch each other's vagina and breasts. In her testimony, A.H. confirmed that she was forced to touch B.H.'s vagina and that B.H. was forced to touch A.H.'s vagina. When describing these incidents, she said that it occurred more than three times, but she did not provide any distinguishing details regarding the additional instances.

After A.H. finished her testimony, B.H. was called to the stand. During her testimony, B.H. recalled that Hodge would take her and her sister to Lindsey Materials on the weekends when the business was closed and would inappropriately touch them at various spots on the property. In her testimony, B.H. recalled that one time when they were at the tunnel,[5] Hodge attempted to penetrate her anus with his penis. In discussing this incident, she explained that she was not "sure if it went in" but that she felt "pressure and it really hurt" and testified that she thought it occurred in the summer of 2005. Although B.H. testified that Hodge engaged in that type of conduct more than once and that it occurred in other places on the property as well, she did not provide additional details regarding those separate oc-

---

4. In her testimony, A.H. explained that on the same day that Hodge penetrated her anus, B.H. was also present and that after Hodge finished assaulting her, he began performing similar behavior with B.H. However, A.H. also admitted that it was dark but stated that she knew something was happening because she could hear B.H. screaming.

5. Consistent with A.H.'s testimony, B.H. described the area as having a conveyor belt that went into a hole in the ground. In addition, a photo of that area was admitted into evidence and shows a tunnel into the ground with a conveyor belt going into the hole.

currences and instead testified generally regarding the mechanics of what Hodge did and asked her to do in all of those instances. When describing other types of behavior that occurred at the tunnel, B.H. related that on several occasions Hodge penetrated her vagina with his finger in the summers of 2005 and 2006 and touched her breasts.

In addition to describing what happened at the tunnel, B.H. testified regarding events that occurred at the swimming hole. She stated that Hodge would take her and sometimes her sister to the area during the summers between 2004 and 2006, that Hodge would ask her if she wanted to go swimming after arriving at his work, that she would say that she did not have a swimsuit, and that Hodge would tell her to "take your clothes off and then just go swimming." Further, she testified that while she was in the water, Hodge on more than ten occasions tried to touch her on her buttocks and "kind of sort of my breast" but stated that "he never really got to touch me when we were" swimming. Moreover, B.H. explained that although some of the same things that happened to her at the tunnel happened at the swimming hole, she did not "remember much about the—when we went to the" swimming hole and that most of what she remembered happened at the tunnel.

As well as testifying about incidents that occurred at Lindsey Materials, A.H. and B.H. also testified regarding events that occurred outside of Burnet County and, accordingly, that were not alleged in the indictments. Specifically, A.H. described incidents that occurred in Lampasas County in the garage of their home, in her bedroom, and in a tent in her backyard. When describing the misconduct that occurred in the garage, A.H. stated that Hodge would pull off her clothes, touch her vagina, and grope her buttocks and

her breasts under her clothing. Moreover, she described the behavior as occurring "[a] lot, honestly" and a lot more than ten times. Further, she recalled that the behavior escalated to where Hodge started inserting his fingers into her vagina and rubbing his penis on her vagina and that this occurred on multiple occasions between 2005 and 2007. When discussing how often Hodge inserted his fingers into her vagina, A.H. explained that it was more than ten times. Similarly, when discussing what happened in her bedroom, A.H. related that Hodge would wake her up in the morning, insert his fingers into her vagina, and fondle her breasts underneath her clothes. Regarding the tent, A.H. testified that Hodge forced her to grab his penis and move her hand "up and down" and placed his penis in her mouth.

After describing the misconduct at her home, A.H. also discussed inappropriate sexual behavior occurring at her grandfather's home, in Hodge's truck, and at her school. Regarding her grandfather's house, A.H. explained that Hodge drove her to her grandfather's house because her grandfather had forgotten something at his house and that while they were inside the house, Hodge "pushed my head down over the couch, and he pulled my pants down to my ankles, and he unzipped his pants, and he pulled his penis out and he stuck it in between my butt and started rubbing against it." Regarding Hodge's truck, she testified that Hodge told her that he was going to teach her to drive and that during the lesson, he touched her vagina with his fingers after pulling her close to him. Regarding her school, she recalled that Hodge took her to the picnic tables at her school at night when she was either in the fifth grade or the sixth grade, "rubbed his penis against my butt" and vagina, and "stuck his fingers inside my vagina and he started kissing me on my neck and grabbing my boobs."

During B.H.'s testimony, she discussed misconduct that occurred at their home in Lampasas County and misconduct that occurred after she, Hodge, and her mother moved to Wyoming. Regarding the house in Lampasas County, she mentioned that Hodge touched her inappropriately in their garage and in the laundry room. Specifically, she recalled that Hodge inserted his fingers into her vagina in the laundry room and touched her vaginal area, her breasts, and her buttocks while they were in the garage. Regarding activity that occurred in Wyoming, she related that Hodge would touch her in inappropriate ways in a shed outside of their new home. In particular, she stated that Hodge penetrated her anus with his penis, that he used a substance to numb and lubricate her anus and applied it with his fingers, and that this occurred "all the time." She also specified that Hodge would touch her breasts and put his mouth on her breasts. In addition to discussing things that occurred in the shed, B.H. stated that on more than one occasion and at a bridge that was near her home, Hodge penetrated her anus with his penis. Finally, B.H. explained that Hodge worked as a truck driver when they moved to Wyoming and that while she was in the truck with him on a trip, he inserted his finger into her vagina and then later inserted a sex device into her vagina.

In addition to calling the two sisters to the stand, the State called Officer Jeff Sheaman and Debbie Coates as witnesses.[6] Officer Sheaman was one of the officers who investigated allegations regarding Hodge that occurred in Wyoming. In his testimony, Officer Sheaman explained that he found in the shed outside Hodge's home a tube of a product called "Anal Ease" wrapped in a pair of underwear as well as a sex device. Further, Officer Sheaman explained that when Hodge was questioned about the sex toy, he admitted that he gave a sex toy to B.H. because she was curious about sex and that he kept it in the shed beside their home.

When called to the stand, Coates testified that she is a sexual-assault-nurse examiner and that she examined A.H. when she was eighteen years old. Coates related during her testimony that A.H. stated that Hodge had inserted his fingers into her anus several times and did so two to three times a week, that Hodge inserted his fingers into her vagina, that Hodge had anal sex with her, that he forced her to perform oral sex on him, and that he forced her and her sister to perform sex acts on one another. Coates also related that A.H. recalled that Hodge put his mouth on her sexual organ. When describing her evaluation of A.H., Coates stated that A.H. had an injury to her vagina but also agreed that the injury could have occurred through sex with her husband or through childbirth. In addition, Coates described an injury to A.H.'s anus and remarked that it was unusual to see injuries to the anus even if it has been penetrated.

After the State rested its case, Hodge called Jessica Vanfossen to the stand. Vanfossen explained that she had been friends with Hodge for over twenty years and had been friends with Donna for even longer.

---

**6.** The State also called Officer Tracy Hallman to the stand. In her testimony, Officer Hallman explained that she worked for the Burnet County Sheriff's Department, that her Department was informed about investigations pertaining to Hodge that were being conducted by police departments in Wyoming and in Lampasas County regarding acts of alleged sex abuse committed by Hodge against his daughters, and that her Department was told that those investigations revealed that the same type of misconduct allegedly occurred in Burnet County at Hodge's place of employment. Officer Hallman also provided a general description of the quarry where Hodge previously worked.

Moreover, she related that she visited Hodge and stayed at his house when B.H. became sick, that she visited the quarry with Hodge and A.H., and that she never saw anything inappropriate occur. In addition, she explained that Hodge, his wife, some of his friends, and B.H. temporarily moved in with her when they moved to Wyoming, that she never saw or heard anything indicating that Hodge had touched B.H. inappropriately, that none of the children in the home made any outcry to her, and that B.H. loved her father and "always seemed real happy to see him, loved going places with him." Moreover, Vanfossen recalled that after she learned that a friend of hers had been arrested for assaulting a child, she asked B.H. if anyone had every inappropriately touched her, and B.H. answered, "Oh, no, absolutely not." Finally, Vanfossen testified that she later learned that A.H. and B.H. made an outcry regarding Hodge to Donna but that Donna did not report the alleged abuse to the authorities.

Next, Hodge called Jessica Stoner to the stand. In her testimony, Stoner revealed that Hodge is her stepfather, that Donna is her mother, and that she lived with Hodge and Donna from 1996 to 2009. In addition, she related that she went to the quarry with Hodge, that Hodge never touched her inappropriately, that she had no knowledge of Hodge ever taking A.H. or B.H. to the quarry without anyone else accompanying them, that she never saw Hodge touch A.H. or B.H. inappropriately, that she asked B.H. if she had ever been abused by anyone while they were living together in Wyoming, and that B.H. said no. During her cross-examination, Stoner admitted that it was possible that Hodge took A.H. and B.H. to the quarry without her knowledge.

Finally, Hodge called his father, Jeston Hodge, to the stand. In his testimony,

Jeston recalled that his granddaughter A.H. called him over a year before the trial started, stated that she needed money, and said that if he did not give her money, "she would make it rough on me and my son." During his cross-examination, Jeston admitted that he did not know for sure if anything happened at the quarry.

## DISCUSSION

### Motion to Sever

 In his first issue on appeal, Hodge contends that the district "court erred in denying [his] motion to sever since the overlap of the alleged acts of prohibited sexual conduct concerned two victims" and since testimony was admitted regarding acts that allegedly occurred in Wyoming even though "only one of the complainant's lived with [him] in Wyoming." When presenting this issue on appeal, Hodge notes that during the trial, B.H.'s testimony focused on sexual assaults occurring in Wyoming that had nothing to do with A.H. and also discussed a book that the police found in Wyoming that B.H.'s grandmother gave her warning of the dangers of sexual abuse called "Red Flag, Green Flag" on which B.H. had written "Daddy red flags me." Moreover, Hodge contends that the portion of B.H.'s testimony relating to conduct at his place of employment in Burnet County focused on conduct aimed at her and not A.H. Similarly, Hodge highlights that in A.H.'s testimony, she discussed several offenses allegedly occurring at her home in Lampasas that had no bearing on B.H. Furthermore, Hodge refers to the fact that Officer Sheaman was allowed to testify regarding his investigation into offenses occurring in Wyoming concerning B.H., including the fact that the police in Wyoming found a sex device in the shed behind Hodge's house that Hodge later admitted that he gave to his daughter, and

again urges that those offenses had nothing to do with A.H.[7]

In light of the preceding, Hodge contends that the "evidence as to the extraneous offense evidence was irrelevant due to geographical jurisdiction and also because of the different complainant. This evidence was admitted in this trial that would otherwise not be relevant to the incidences to [A.H.] and vice versa." In addition, Hodge insists that "the sheer amount, and the details of this evidence could only serve to inflame the jury and prejudice the defense, while hampering the defendant's counsel." Accordingly, he urges that "[i]t is conceivable that [he] would not have been convicted for the offenses listed in the indictment for cause number 41288 regarding A.H. had he been granted his request for separate trials."

■■■ "A defendant may be prosecuted in a single criminal action for all offenses arising out of the same criminal episode." Tex. Penal Code § 3.02(a). A "'criminal episode' means the commission of two or more offenses, regardless of whether the harm is directed toward or inflicted upon more than one person or item of property" when "the offenses are committed pursuant to the same transaction or pursuant to two or more transactions that are connected or constitute a common scheme or plan" or when "the offenses are the repeated commission of the same or similar offenses." Id. § 3.01. "Whenever two or more offenses have been consolidated or joined for trial ..., the defendant shall have a right to a severance of the offenses." Id. § 3.04(a). However, "[t]he

right to severance under this section does not apply to a prosecution for," among other offenses, indecency with a child and aggravated sexual assault of a child "unless the court determines that the defendant or the state would be unfairly prejudiced by a joinder of offenses, in which event the judge may order the offenses to be tried separately or may order other relief as justice requires." Id. § 3.04(c); see also id. § 3.03(b) (listing offenses for which automatic right to severance is not applicable). For these types of offenses, there is no presumption that the joinder of cases with different child victims is unfairly prejudicial, see Matthews v. State, 152 S.W.3d 723, 730–31 (Tex.App.—Tyler 2004, no pet.), and the defendant bears the burden of showing how he would be unfairly prejudiced through consolidation, see Lane v. State, 174 S.W.3d 376, 380 (Tex.App.—Houston [14th Dist.] 2005, pet. ref'd). Appellate courts review a trial court's decision to grant or deny a request to sever for an abuse of discretion. See Salazar v. State, 127 S.W.3d 355, 365 (Tex.App.—Houston [14th Dist.] 2004, pet. ref'd). Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside the zone of reasonable disagreement, Lopez v. State, 86 S.W.3d 228, 230 (Tex.Crim.App. 2002), or is arbitrary or unreasonable, State v. Mechler, 153 S.W.3d 435, 439 (Tex. Crim.App.2005).

The conduct alleged in the indictments specified that Hodge abused his two daughters in similar ways over the same two-year period and sometimes while the

7. In his brief, Hodge notes that the State asked Officer Sheaman a question regarding an admission that Hodge made when he was questioned by the police in Wyoming and urges that the admission had nothing to do with the allegations at issue in either cause. Before Officer Sheaman answered the question, Hodge raised an objection. In a hearing

held outside the presence of the jury, the parties discussed how Hodge admitted during his questioning by police that he masturbated in front of B.H. because she was curious about sex. However, the State decided not to pursue that line of questioning, and Officer Sheaman did not testify regarding the admission in front of the jury.

daughters were in the presence of one another. Accordingly, the district court could have reasonably concluded that the conduct fell within the definition of a "criminal episode" because it involves the repeated commission of the same or similar offenses. *See* Tex. Penal Code § 3.01; *Cobb v. State*, 85 S.W.3d 258, 266 (Tex. Crim.App.2002) (discussing what constitutes "[a] single 'criminal episode,' as defined in Penal Code section 3.01"); *see also Waddell v. State*, 456 S.W.3d 366, 370 (Tex. App.—Corpus Christi 2015, no pet.) (explaining that to qualify as same criminal episode, "it need only be shown that the offenses for which a defendant was charged and convicted were the repeated commission of the *same* or *similar* offense" and does not require proof that offenses were committed in same or similar fashion). *Compare Riemer v. State*, Nos. 02–12–00613–CR, –00614–CR, –00615–CR, 2013 WL 6565057, at *1, *3, *4 (Tex.App.—Fort Worth Dec. 12, 2013, no pet.) (mem. op., not designated for publication) (concluding that trial court did not err by denying motion to sever indecency charges regarding defendant's stepdaughter for conduct in 2000 from aggravated-sexual-assault charges regarding defendant's daughter for conduct occurring in 2002 because conduct "fit squarely within the definition of criminal episode with regard to the repeated commission of the same or similar offense" and because "the trial court could have reasonably concluded that the stepsisters had experienced similar offenses regardless of a two-year separation"), *and Casey v. State*, 349 S.W.3d 825, 830–31 (Tex.App.—El Paso 2011, pet. ref'd) (determining that "the trial court could have reasonably concluded that all the offenses alleged in the indictment were part of the same criminal episode because they were the repeated commission of the same or similar offenses" where evidence showed that victims went to same school and that defendant sexually abused primary victim at various times between 2002 and 2008 and sexually abused secondary victim one time in 2006 when both victims were at defendant's home), *with Darling v. State*, 262 S.W.3d 920, 926 (Tex.App.—Texarkana 2008, pet. ref'd) (deciding that trial court erred by denying motion to sever indecency charge for conduct occurring in 2004 from aggravated-assault charges stemming from conduct in 1993 and 1995 because earlier crimes "involved a different manner of commission, involved a different degree of severity, and involved different victims" and because "[t]here was no evidence adduced at trial to suggest any direct linkage between the commission of this indecency crime and those earlier time periods").

Regarding whether there was any unfair prejudice, we note that for cases "involving multiple felony counts of alleged sex offenses against children, the legislature has balanced competing interests and has determined that the defendant is entitled to sever only if he can show 'unfair' prejudice—i.e., some type of prejudice beyond that which he would automatically face in any case in which felony counts are joined." *Riemer*, 2013 WL 6565057, at *4; *see also Hicks v. State*, Nos. 07–12–00256—00276–CR, 2013 WL 4711223, at *2 (Tex.App.—Amarillo Aug. 28, 2013, no pet.) (mem. op., not designated for publication) (explaining that legislature decided to exclude certain crimes from automatic right to severance because it believed that those types of offenses are likely to be repeatedly committed against child victim or multiple child victims and because legislature wanted to avoid having to force child victims to undergo multiple trials); *Casey*, 349 S.W.3d at 832 (discussing legislature's balancing of interests present in trials "involving multiple felony counts of alleged sex offenses against children" with

following two types of prejudice defendant may face when multiple felonies are joined: "first, the jury may convict him of some of the crimes alleged not because he is guilty of those crimes but because he is guilty of the other crimes and is therefore, in the eyes of the jury, a 'bad person' who deserves to be punished; and second, the jury may infer that because he committed some of the alleged crimes, he probably committed all of them").

Although the joinder of the two causes required the State to put on evidence regarding all of the counts pertaining to the two sisters, as set out above, a defendant must establish that joinder would result in prejudice going beyond what would be inherent in the joinder of felony offenses into one trial. When Hodge filed a motion to sever and during the hearing on the motion, he did not identify how he would have been unfairly prejudiced by the joinder other than by asserting that trying the cases together would result in "cumulative evidence" being introduced, which would ostensibly prevent him from receiving a fair trial. In addition, even if the causes had been severed, both sisters would likely have testified in each cause regarding the counts asserting that Hodge forced the sisters to touch each other in a sexual manner.

In addition, before the trial started, the State informed Hodge of its intent to present evidence of extraneous offenses under article 38.37 of the Code of Criminal Procedure and Rule of Evidence 404. The notices in each respective cause listed as extraneous offenses the acts that Hodge committed against the sister who was the victim in the other cause that occurred in Lampasas County or Wyoming but also listed those offenses occurring in Burnet County that were alleged in the respective indictments.

Under Rule 404, evidence of other crimes or bad acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b). Moreover, for trials involving certain offenses, including indecency with a child and aggravated sexual assault of a child, section 1 of article 38.37 *requires* the admission of "evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense" "[n]otwithstanding Rules 404 and 405, Texas Rules of Evidence," "for its bearing on relevant matters, including: (1) the state of mind of the defendant and the child; and (2) the previous and subsequent relationship between the defendant and the child." Tex. Code Crim. Proc. art. 38.37, § 1. In addition, section 2 of article 38.37 broadens the potential uses for evidence of other offenses and bad acts in a trial for various sexual offenses and broadens the types of evidence that may be admitted to include evidence of offenses committed against children who are not the alleged victim in the trial. Specifically, section 2 provides that "[n]otwithstanding Rules 404 and 405, Texas Rules of Evidence, ... evidence that the defendant has committed a separate offense described by Subsection (a)(1) or (2)," including indecency with a child and aggravated sexual assault of a child, "may be admitted in the trial of an alleged offense described by Subsection (a)(1) or (2) for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defen-

dant." *Id.* § 2.[8]

Accordingly, even if the district court had granted Hodge's motion to sever, it is likely that all of the evidence referred to by Hodge would have been introduced into evidence in both trials anyway under Rule 404 or article 38.37. *See Riemer*, 2013 WL 6565057, at *4 (determining that defendant was not unfairly prejudiced by joinder of felony offenses because "in each case the two complainants' testimonies would have been admissible"); *cf. Scott v. State*, 235 S.W.3d 255, 259 (Tex.Crim.App.2007) (noting in harm analysis that defendant was not harmed by trial court's failure to sever counts of possession of child pornography that he pleaded guilty to from charges regarding sexual performance by child because, among other reasons, "evidence of the underlying conduct involved in his guilty plea to each Count Three—the videotapes—would have been admissible in his trial for Counts One and Two").

For all of these reasons, we cannot conclude that the district court abused its discretion by determining that Hodge failed to meet his burden of establishing that he would be unfairly prejudiced by the joinder of the two causes.

In light of the preceding, we overrule Hodge's first issue on appeal.

**Unanimity Instruction**

■ In his second issue on appeal, Hodge asserts that the district "court committed jury charge error by failing to give a unanimity instruction as to each separate criminal incident alleged at trial, as charged in each separate county/offense in the indictment."

■ Appellate courts review claims regarding alleged jury-charge errors under a two-pronged test, *see Swearingen v. State*, 270 S.W.3d 804, 808 (Tex.Crim.App. 2008), with the first prong being a determination regarding "whether error exists," *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim.App.2005). Regarding whether there was error in the jury charge, the governing law in Texas requires that a jury verdict be unanimous in all criminal cases. *See* Tex. Code Crim. Proc. art. 36.29(a); *Cosio v. State*, 353 S.W.3d 766, 771 (Tex.Crim. App.2011). In other words, "the jury must be unanimous in finding every constituent element of the charged offense in all criminal cases." *Jourdan v. State*, 428 S.W.3d 86, 94 (Tex.Crim.App.2014). In this context, unanimity "means that the jury must 'agree upon a single and discrete incident that would constitute the commission of the offense alleged.'" *Cosio*, 353 S.W.3d at 771 (quoting *Stuhler v. State*, 218 S.W.3d 706, 717 (Tex.Crim.App.2007)). Accordingly, "'the jury must be instructed that it must unanimously agree on one incident of criminal conduct (or unit of prosecution), based on the evidence, that meets all of the essential elements of the single charged offense beyond a reasonable doubt.'" *Saenz v. State*, 451 S.W.3d 388, 390 (Tex.Crim.App.2014) (quoting *Cosio*, 353 S.W.3d at 776).

Regarding when non-unanimity issues might arise, the court of criminal appeals has explained that there are "three variations that may result in non-unanimous verdicts as to a particular incident of criminal conduct that comprises the charged offense." *Cosio*, 353 S.W.3d at 771 (internal footnote omitted). Moreover, the court

---

**8.** Before evidence may be admitted under section 2 of article 38.37, the trial court is required to conduct a hearing outside the presence of the jury to determine whether "the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt." Tex. Code Crim. Proc. art. 38.37, § 2-a. On appeal, Hodge does not assert that those requirements were not met in this case.

warned that "[n]on-unanimity may result in each of these situations when the jury charge fails to properly instruct the jury, based on the indicted offense(s) and specific evidence in the case, that its verdict must be unanimous." *Id.* When presenting his issue on appeal, Hodge relies on the second set of circumstances identified by the court of criminal appeals in which it explained that "non-unanimity may occur when the State charges one offense and presents evidence that the defendant committed the charged offense on multiple but separate occasions" and when "[e]ach of the multiple incidents individually establishes a different offense or unit of prosecution." *See id.* at 772 (internal footnote omitted). Accordingly, the court explained that "to ensure unanimity," the jury charge "would need to instruct the jury that its verdict must be unanimous as to a single offense or unit of prosecution among those presented." *Id.*

As an initial matter, we note that the jury charges in this case contained a general unanimity instruction informing the jury that they were required to "arriv[e] at a unanimous verdict in each count" at the end of the jury charges and also contained additional unanimity instructions that were specifically included at the request of Hodge after he objected to the general unanimity instruction as being insufficient. Specifically, Hodge filed a motion requesting that "a specific unanimity instruction" be given "for each count in both cases." Further, Hodge asserted in his motion that "the standard unanimity instruction here is insufficient" and requested "a specific instruction requiring the jury to be unanimous, for each count, about the precise criminal conduct committed within Burnet County and not simply unanimous about the offenses." Similarly, when discussing this request during the charge conference at the end of the guilt-or-innocence phase, Hodge explained that he wanted additional unanimity instructions, and the district court agreed to the request. That exchange occurred as follows:

[Hodge]: First, with respect to my first objection, Roman Numeral One, I'm requesting a more specific unanimity instruction. I would propose that in each count when you look at the paragraphs we always see, "And bearing in mind the foregoing instructions, comma, if you believe from the evidence beyond a reasonable doubt". I would suggest that inserting the word "unanimously" after the word "you" and before the word "believe" in each count would address that.

[District Court]: Okay. State?

[State]: Agreed, Your Honor.

[District Court]: All right. Then I will order that we insert the term "unanimously" after the word "you" and before the word "believe" as to each of the application paragraphs in each of the charges.

In light of the district court's ruling, the portions of the jury charge in both causes listing the alleged counts were modified to include in each count the language "if you unanimously believe from the evidence beyond a reasonable doubt that" Hodge committed the particular offense "on or about" a specific date in Burnet County.

Although Hodge acknowledges that he requested the modifications listed above, he asserts that his requested modifications were insufficient because the State presented evidence of more than one incident to prove that Hodge committed the offense alleged in each count. *See id.* at 770, 774 (determining that there was error in jury charge where charge contained four felony counts, where evidence showed that there was more than one occasion of misconduct supporting each count, and where jury charges generally instructed jury at end of each charge that jury's verdict must be

unanimous but did not specify that it had to be unanimous about which instance constituted commission of offense for each count and explaining that charge "allowed for the possibility that the jury rendered non-unanimous verdicts"); *Ngo*, 175 S.W.3d at 742, 745, 749 (concluding that jury charge for offense of credit card abuse that specified in " 'boilerplate' section" of charge dealing with jury-foreperson selection that jury must unanimously agree "upon a verdict" and allowed jury to convict if defendant stole card, received stolen card, or fraudulently presented card was erroneous because it did not inform jury that "it was required to reach a unanimous verdict concerning one specific criminal act" and, accordingly, could have misled jury "into believing that only its ultimate verdict of 'guilty' need be unanimous"). Accordingly, Hodge insists that the district court should have submitted unanimity instructions for each count that informed the jury that it "must not find the defendant guilty of this count unless you all agree on which incident, or incidents occurred, if you believe that the incident or incidents occurred at all, beyond a reasonable doubt. If you so believe, you need not all agree on every incident alleged for this count, as long as there is one incident, on which all the jurors are unanimous as to whether this incident occurred."

Unquestionably that type of instruction would have prevented the type of mismatch that Hodge contends may have oc-

curred in this case, but we also recognize that the same effect can be produced through instructions that are worded differently and are not persuaded that the failure to provide an instruction substantially similar to the one suggested by Hodge would automatically result in jury-charge error. *See Ngo*, 175 S.W.3d at 749 (explaining that erroneous jury charge "would have been clearly correct had each paragraph included just one additional word: 'unanimously,' such that all twelve jurors would immediately realize that they had to agree on one specific paragraph which set out one specific criminal act"); *see also Curry v. State*, 222 S.W.3d 745, 753 (Tex.App.—Waco 2007, pet. ref'd) (noting that courts presume that jury followed general unanimity instruction). Moreover, although Hodge asserts that the inclusion of the word "unanimous" in each count was insufficient because the State presented evidence of multiple instances of misconduct that the jury could have relied on when determining if Hodge committed some or all of the alleged counts and asserts that "the jury should have been instructed that in order to convict on each count, it must have been unanimous in believing that all of the elements of the offense alleged in the count were proven, beyond a reasonable doubt, as to each individual incident," it is not entirely clear from our review of the record that the concern raised by Hodge was present in this case.[9]

9. To the extent that Hodge is asserting in his brief that members of the jury could have determined that Hodge committed one or more of the alleged counts by relying on evidence of the offenses occurring in Lampasas County or Wyoming, we note that the jury charge contained an extraneous-offense instruction explaining that the jury could not consider that type of evidence unless the jury determined beyond a reasonable doubt that Hodge committed the extraneous offenses and then "may only consider" the evidence "for

the purpose of determining any relevant matters," including the state of mind of Hodge and the alleged victims, "the previous and subsequent relationship between" Hodge and the victims, and "the character of the defendant and acts performed in conformity with" Hodge's character. Moreover, the jury charges also specified that Hodge was "on trial solely on the charges contained in the indictment." *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex.Crim.App.2005) (explaining that appellate courts "presume the jury fol-

In cause number 41288, there was only one count (count one) pertaining to the penetration of A.H.'s anus by Hodge's penis, and A.H. testified that Hodge performed the act only once. Similarly, there was only one count (count two) pertaining to the penetration of A.H.'s mouth by Hodge's penis, and in her testimony, A.H. only mentioned Hodge penetrating her mouth once. There were four counts (counts three, six, nine, and twelve) asserting that Hodge penetrated A.H.'s vagina with his finger, and A.H. testified that Hodge penetrated her vagina with his finger on more than three occasions when Hodge told her that he was going to teach her to drive some of the work equipment and on another occasion in a building on the property. When testifying regarding these four or possibly more acts, A.H. did not provide any information regarding a date on which those events happened or explain how those acts occurred chronologically or otherwise distinguish them other than by saying that one event occurred in a building and that the others occurred while Hodge was teaching her to use different types of equipment. In addition, there were four counts (counts four, five, eight, and eleven) asserting that Hodge caused A.H.'s sexual organ to contact his mouth. During the trial, A.H. related that Hodge licked her vagina at the swimming hole on five or more occasions but did not provide any distinguishing information regarding when those events occurred in relation to one another. Further, there were two counts (counts seven and ten) alleging that Hodge caused A.H.'s sexual organ to contact his sexual organ, and in her testimony, A.H. stated that on two or more occasions while they were at the swimming hole, Hodge touched her vagina with his penis but did not provide any additional distinguishing details.

For cause number 41288, three counts (counts thirteen, fourteen, and fifteen) alleged that Hodge caused A.H. to touch the genitals or breasts of B.H. Similarly, for cause number 41289, there were three counts (counts eight, nine, and ten) asserting that Hodge caused B.H. to touch the genitals or breasts of A.H. During her testimony, A.H. explained that on more than three occasions, Hodge forced her and B.H. to touch the other's breasts and vagina at the swimming hole but did not provide any additional information about those incidents. For cause number 41289, only one count (count one) contended that Hodge penetrated B.H.'s anus with his penis, and during her testimony, B.H. testified regarding efforts Hodge made to penetrate her anus with his penis while they were in the tunnel. Although B.H. later explained that Hodge engaged in that same behavior more than once, she did not provide any additional details. Finally, for cause number 41289, there were three counts (counts three, five, and seven) asserting that Hodge penetrated B.H.'s vagina with his finger, and B.H. testified that Hodge inserted his finger into her vagina "[p]lenty of times" in 2005 and 2006 when they would go to the tunnel and agreed that it happened "lots of time[s]."

As shown above, for several of the counts in both cause numbers, the testimony from A.H. and B.H. regarding how many times a particular type of misconduct occurred matched up with the number of counts alleging that type of conduct. Moreover, for the remaining counts, the testimony from the girls provided details regarding specific types of offenses that Hodge committed and then generally asserted for some of those offenses that the behavior was repeated on multiple occasions, and their testimonies regarding the

lows the trial court's instructions in the man- ner presented").

number of times the acts were performed and repeated either matched the total number of counts for each type of misconduct or asserted that even more acts occurred than were listed in the jury charges. In addition, no evidence other than the testimony of the girls was introduced regarding the offenses allegedly occurring at the quarry, and the general testimony from the girls asserting that certain behavior was repeated multiple times did not provide a basis upon which members of the jury could have concluded that Hodge was guilty of the counts but disagreed regarding the particular acts supporting each count.

Furthermore, although counts thirteen through fifteen in cause 41288 and counts eight through ten in cause 41289 alleged that Hodge committed indecency with a child by causing the girls to touch the "genitals *or* breasts" of the other sister, no evidence was introduced establishing that the two types of touching occurred on separate occurrences. *Cf. Francis v. State*, 36 S.W.3d 121, 122, 125 (Tex.Crim.App.2000) (op. on reh'g) (concluding there was jury-charge error allowing for non-unanimous conviction where defendant was charged with one count of indecency, where jury charge allowed conviction on finding that defendant touched breasts *or* genitals of victim, where State presented evidence of four acts occurring on different dates with two acts involving improper touching of victim's breasts and two acts involving improper touching of victim's genitals, and where State "elected to pursue a conviction on two of the incidents, one involving the touching of the victim's breasts and one involving the touching of the victim's genitals" because "it is possible that six members of the jury convicted appellant on the breast-touching offense (while the other six believed he was innocent of the breast-touching) and six members convicted appellant on the genital-touching offense (while the other six believed he was innocent of the genital-touching)"). On the contrary, A.H. testified that when those instances of misconduct occurred, Hodge made each girl touch the breasts and the vagina of the other girl.[10]

[redacted] In light of the preceding, it is not entirely clear that there was any error in the jury charge. However, for the sake of argument, we will assume that there was

10. In his brief, Hodge asserts that the allegations pertaining to the indecency-with-a-child counts "could have been proven by any of the incidents that alleged the commission of aggravated sexual assault" listed in the aggravated-sexual-assault counts "all of which subsume the indecency by sexual contact elements" for the indecency counts. *Cf. Evans v. State*, No. 04-08-00076-CR, 2008 WL 4862551, at *2, *3 (Tex.App.—San Antonio Nov. 12, 2008) (mem. op., not designated for publication) (finding double-jeopardy violation where defendant was charged with aggravated sexual assault of child and indecency with child, where offenses were alleged to have occurred on same day, and where "evidence show[ed] only one sexual act, not separate and distinct sexual acts"), *aff'd* 299 S.W.3d 138, 143 (Tex.Crim.App.2009) (determining that appellate court correctly concluded that indecency with child was lesser-included offense of aggravated sexual assault of child "when both offenses are predicated on the same act"). However, although the indictment alleged that the indecent contact occurred "on or about" the same day listed in some of the aggravated-sexual-assault counts, A.H. did not testify that the offenses involving indecent contact occurred on the same day. More importantly, the conduct at issue in the indecency counts involved sexual acts that were separate and distinct from the conduct alleged in the aggravated-sexual-assault counts and involved additional parties. *Cf. Martinez v. State*, No. 04-05-00743-CR, 2006 WL 2612517, at *4 (Tex.App.—San Antonio Sept. 13, 2006, no pet.) (mem. op., not designated for publication) (concluding that there was no double-jeopardy violation where jury could find from evidence that defendant "was guilty of separate acts of penetration and sexual contact").

error. As discussed previously, courts review an issue alleging jury-charge error under a two-pronged analysis, *Swearingen*, 270 S.W.3d at 808, and the second prong in that analysis requires courts to evaluate the harm caused by the error, *Ngo*, 175 S.W.3d at 743. The amount of harm needed for a reversal depends on whether a complaint regarding "that error was preserved in the trial court." *Swearingen*, 270 S.W.3d at 808. If the defendant made a timely objection, reversal is required if there has been "*some* harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (op. on reh'g). However, if no objection was made, a reversal is warranted only if the error resulted in "egregious harm." *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim.App.2008).

▪ Previously, we discussed how Hodge filed a motion seeking a unanimity instruction for each count in both causes and objected to the general unanimity instruction in the jury-charge hearing and how the district court agreed to provide the instruction requested by Hodge. After addressing other objections to the charge that are not relevant to the issues on appeal in this case, the district court asked the parties if there were additional concerns about the jury charge, and Hodge answered, "No, Your Honor." Following the district court's decision to provide the instructions requested by Hodge, Hodge made no other unanimity objection. Accordingly, Hodge has failed to preserve a unanimity complaint for appellate purposes. *See* Tex. R. App. P. 33.1(a) (stating that to preserve error for appeal, record must show that complaint was made to trial court and that trial court ruled on request or refused to rule and that "complaining party objected to the refusal"); *Estes v. State*, 487 S.W.3d 737, 761 (Tex. App.—Fort Worth 2016, pet. filed) (noting that for complaint to be preserved, "there

must be an adverse ruling by the trial court"). For that reason, we must evaluate whether Hodge was egregiously harmed by the jury-charge error.

▪ "Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Allen v. State*, 253 S.W.3d 260, 264 (Tex.Crim.App.2008). "If the charge error caused the jury, in fact, to render a less-than-unanimous verdict on an issue on which unanimity is required, the charge error is egregiously harmful." *Swearingen*, 270 S.W.3d at 812. "The purpose of the egregious-harm inquiry is to ascertain whether the defendant has incurred actual, not just theoretical, harm," *id.* at 813, and "reversal for an unobjected-to erroneous jury instruction is proper only if the error caused actual, egregious harm to" the defendant, *Arrington v. State*, 451 S.W.3d 834, 840 (Tex.Crim.App.2015). The determination depends "on the unique circumstances of" each case and "is factual in nature." *Saenz v. State*, 479 S.W.3d 939, 947 (Tex.App.—San Antonio 2015, no pet.); *see Ellison v. State*, 86 S.W.3d 226, 227 (Tex.Crim.App.2002) (stating "that egregious harm is a difficult standard" to meet). Neither side has the burden of establishing either the presence or a lack of harm. *See Warner v. State*, 245 S.W.3d 458, 464 (Tex.Crim.App.2008). Instead, the reviewing court makes its own assessment when evaluating what effect an error had on the verdict by looking at the record before it. *Ovalle v. State*, 13 S.W.3d 774, 787 (Tex.Crim.App.2000). "When assessing harm based on the particular facts of the case, we consider (A) the entire jury charge; (B) 'the state of the evidence[,] including contested issues and the weight of the probative evidence'; (C) the parties' arguments; and (D) all other relevant information in the record." *Arrington*, 451

S.W.3d at 840 (quoting *Cosio*, 353 S.W.3d at 777). The analysis is "fact specific and is done on a 'case-by-case basis.'" *Id.* (quoting *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex.Crim.App.2013)).

### The Entire Jury Charge

As discussed previously, although the jury charge did not have the language that Hodge now asserts on appeal was necessary to inform the jury that it must unanimously agree about which instance of a type of alleged conduct occurred in order to find Hodge guilty of any particular count, the jury charge instructed the jury that they are to arrive "at a unanimous verdict in each count" and further instructed the jury in each count that it could only find Hodge guilty of the count if it "unanimously believe[d]" that he was guilty of a particular offense beyond a reasonable doubt based on the evidence presented. Moreover, as discussed earlier, the type of testimony presented in this case does not seem to present the problem discussed in the cases relied on by Hodge in which a jury might determine that a defendant is guilty of a particular charge but in which members of the jury might disagree about which act supported that determination because evidence regarding multiple discrete acts pertaining to the charge was presented during the trial. *See id.* at 836, 838, 839 (noting that jury instructions did not require jury to be unanimous regarding which conduct "constituted each count," discussing testimony from victim establishing particular days on which various types of misconduct occurred, and summarizing appellate court's reasoning that victim testified to "separate criminal acts that would constitute" offense in several of counts). Accordingly, at most, this factor weighs only slightly in favor of finding egregious harm.

### The State of the Evidence in the Record

■ "[U]nder this prong of an egregious harm review, we look to the state of the evidence to determine whether the evidence made it more or less likely that the jury charge caused appellant actual harm." *Id.* at 840.

As summarized previously, B.H. and A.H. testified regarding various offenses occurring at Hodge's place of employment, and their testimonies generally lined up with the counts contained in the jury charges. Moreover, the testimony from A.H. was consistent with Coates's description of what A.H. revealed during the sexual-assault examination regarding the type of abuse she had been subjected to. In addition, A.H. and B.H. testified regarding extraneous offenses that occurred in Lampasas County and in Wyoming, and their testimonies were consistent with their testimonies regarding misconduct occurring at the quarry. Moreover, the testimony from B.H. pertaining to extraneous offenses occurring in Wyoming was corroborated in part by the portions of Officer Sheaman's testimony in which he related that a numbing and lubricating agent as well as a sex device were found in a shed outside of Hodge's home and in which Officer Sheaman revealed that Hodge admitted to buying B.H. a sex device that he kept in the shed.

During the trial, Hodge attempted to undermine the credibility of A.H. by calling Jeston to the stand to testify that A.H. demanded money from Jeston and threatened to cause him and Hodge trouble if Jeston did not give her money. Further, Hodge called Stoner and Vanfossen to the stand to undermine the credibility of both girls by having them testify that they never saw Hodge interact with the girls in an inappropriate way even though they both lived with Hodge and the girls for extended periods of time and having them testify

that B.H. denied ever having been abused by someone. Moreover, Stoner was called to the stand to testify that she was unaware of Hodge ever taking the girls to the quarry without someone else being present. In his closing arguments, Hodge asserted that there were problems with "the girls' credibility." Regarding B.H., Hodge asserted that her recall was not very good and that her testimony did not match up all the time, and Hodge suggested that the fact that she had been asked to repeat the allegations so many times to so many people may have made the story "more solid" and have made her believe the story even though it was not true. Regarding A.H., Hodge noted that she explained in her testimony that some of the memories of the abuse had been triggered by watching television shows dealing with the subject of sexual abuse of children.

The jury was not persuaded by the testimony of Hodge's witnesses or by his argument that he did not commit the offenses or that there was reasonable doubt. Otherwise, the jury would have acquitted Hodge of all of the counts. In light of the evidence, it seems logical to conclude that the jury's verdicts "were, in fact, unanimous" and that the jury agreed regarding the acts forming the basis for conviction in each count. *See Cosio*, 353 S.W.3d at 778; *see also Ruiz v. State*, 272 S.W.3d 819, 826–27 (Tex. App.—Austin 2008, no pet.) (determining that state of evidence weighed against finding of egregious harm where defendant argued that he committed none of the alleged misconduct and that victim was lying to get revenge on defendant). "Because the entire record fails to show actual harm to" Hodge, "this factor weighs against a finding of egregious harm." *See Arrington*, 451 S.W.3d at 844.

*Parties' Arguments*

■ "Under this factor, we look to whether any statements made by the State, appellant, or the court during the trial exacerbated or ameliorated error in the charge." *Id.*

During the trial, neither the parties nor the district court suggested to the jury that it did not have to be unanimous in its decision. *See id.* (stating that factor did not weigh in favor of or against finding of egregious harm where parties did not tell jurors that they needed to be unanimous or tell jury "that they need not be unanimous"); *Cosio*, 353 S.W.3d at 777 (noting that factor did not weigh in favor of finding egregious harm where parties and trial court did not suggest that jury did not have to be unanimous). On the contrary, the State and Hodge communicated to the jury during their closing arguments that the jury should make its determination based on the evidence of the offenses that took place in Burnet County and that the jury's decisions on each count should be unanimous.

In particular, the State emphasized that "what we brought before for our indictments is the evidence with regard to Lindsey Materials" and instructed the jury that it could not consider the evidence regarding the commission of extraneous offenses unless it first concluded beyond a reasonable doubt that Hodge committed those extraneous offenses and then only "for the purposes of determining any relevant matters, including the state of mind of the defendant and of the girls, the previous and subsequent relationship between the defendant and the girls, and any bearing that evidence has on relevant matters, including character of the defendant and acts performed in conformity of the character of the defendant."

In his closing, Hodge asked the jury to return a verdict of not guilty on all of the

counts and "to take each one of those [counts] individually and take—just go through them line-by-line, element-by-element," including "the dates, the places, and the allegations." Further, Hodge stated as follows:

> In each and every single count you will find at the beginning the phrase 'if you unanimously believe'. Also at the end of the entire charge it tells you to arrive at a unanimous verdict. That means you need to be in [agreement]. The word 'unanimously' is in each and every single count because the counts are individual. This is not an in-mass submission. It's not a yes or no. These are each individual counts. I'm going to ask you to deliberate each count in and of itself and to arrive at a unanimous verdict, as the judge has instructed you [to] do so."

Accordingly, this factor weighs against a finding of egregious harm.

In conclusion, the only factor potentially weighing in favor of an egregious-harm finding "is the consideration of the jury instructions." *See Arrington*, 451 S.W.3d at 845. The potentially "erroneous jury instructions did not cause" Hodge "egregious harm" even if they failed to instruct the jury to be unanimous regarding what particular act or acts "support each count" because "the evidence in the entire record and the analytical meaning of the jury's verdicts in the aggregate show that the erroneous instructions did not cause actual harm to appellant." *See id.*; *see also Cosio*, 353 S.W.3d at 777–78 (finding no egregious harm even though jury instructions allowed for non-unanimous verdicts when other two factors did not weigh in favor of egregious harm).

For these reasons, we overrule Hodge's second issue on appeal.

## CONCLUSION

Having overruled all of Hodge's issues on appeal, we affirm the district court's judgments of conviction.