# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00102-CR

---

**Patrick Leonard Martin, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. CR2017-787, THE HONORABLE DIB WALDRIP, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Patrick Leonard Martin of burglary of a habitation with intent to commit a felony other than theft (Count I), two counts of aggravated kidnapping (Counts III and IV), assault by threat (Count V), aggravated assault with a deadly weapon (Count VI), sexual assault (Count VII), and assault family violence with a previous conviction (Count VIII). *See* Tex. Penal Code §§ 20.04, 22.01(a)(2), .01(b)(2), .02(a)(2), 22.011(a)(1), 30.02. The trial court sentenced Martin to life imprisonment for Count I, sixty years' confinement for Counts III and IV, fifteen years' confinement for Count VII, ten years' confinement for Count VI, and five years' confinement for Count VIII, with the sentences to run concurrently. The court also assessed a $500 fine for Count V. In four issues, Martin challenges the constitutionality of Article 38.371 of the Texas Code of Criminal Procedure, the admission of extraneous-offense evidence, and the propriety of the State's closing argument. In a single issue

on cross-appeal, the State challenges the trial court's ruling for a directed verdict on Count II (injury to an elderly person). *See* Tex. Code Crim. Proc. art. 44.01(c) (governing State appeals). We will affirm the judgments of conviction and acquittal and dismiss the State's cross-appeal for want of jurisdiction.

## BACKGROUND

Kristin Ellington[1] began a dating relationship with Martin in 2014. Martin lived "off and on" with Ellington and her mother, Marcia Larson, at Larson's home in Bulverde, Texas. Although at first the relationship was "great," Ellington at trial testified to a series of abusive incidents that occurred with Martin starting in 2016.

In November of that year, Ellington prepared chili for Martin, when he became upset and demanded she try it. Ellington asked to go outside for some air as she was hyperventilating, but Martin forbade her, blocking the door with a chair or table. Although she could not remember why, Martin choked her "a couple of times." He put his hands around her neck and choked her "to the point where [she] was not coherent of what was going on around [her]" and felt "[d]eath." She was terrified and "was just praying that it wouldn't last long enough to do something to [her] where [she] wouldn't be able to come back from." During the assault, her hearing "dissipated," and she "checked out" and felt like she had "missed time." The choking began in her bedroom, "[o]n her bed" and then she "fell on the floor and it happened there too."

---

[1] The alleged victim's name is variously spelled as "Kristin" and "Kristen" in the Reporter's Record. We will use the former, which is the spelling used in the indictment.

Ellington testified that if Martin said something, she could not hear it. His eyes were "dark," and he was "a different person." As Martin was choking her, she tried to scream, but he put a pillow over her head. When Ellington's eighteen-year-old son, Luke, came home, he heard her crying in the bathroom. Ellington grabbed him and pushed him outside because she was concerned that he would get involved.

The Bulverde Police Department (BPD) was called, and responding officers took photographs of Ellington's injuries. The photographs, admitted over the objections of defense counsel, depicted a red mark on the side of her face; her lip, which "was busted on – on the inside"; and her neck.

Ellington testified that approximately four or five months before the chili incident, but in 2016, she witnessed a second incident involving Luke. On that occasion, she and Martin had gotten into an argument because Martin was "calling and calling," and she would not answer the phone so he came over. Martin pulled the screen off a window of the home, jumped through, and "came to" Ellington. He took her hand and bent it back "really far," which "made [her] scream because it hurt." He then grabbed her hair and pulled her head back and forth as she screamed and cried. Luke, who had been napping on the other side of the house, came out and ordered Martin to leave. Martin grabbed Luke in a chokehold and slammed him on the ground, causing Luke's head to hit the ground.

The third incident about which Ellington testified occurred in July 2017. Martin demanded that Ellington perform oral sex on him. She "didn't want to," and Martin responded that "if not, that – that tomorrow would be a bad day and he wasn't going to let [her] sleep until [she] did." She understood his statement that "tomorrow will be a bad day" to mean that "it

3

would get violent" if she did not comply. Ellington performed oral sex on Martin during which she cried and "felt just like nothing."

The next morning Martin woke up still in a bad mood. He was upset because the night before, Ellington had gone to a friend's house where another man had been present. Martin left the home in Ellington's car, which he used without her permission. She texted him to bring it back "and that he wasn't going to be allowed to stay the night and so he needed to find another place." That night, she woke up to something sharp against her neck and saw Martin standing over her. She testified that he had "the keys – or car keys had turned out – I didn't know – I just knew it felt like something sharp and I was, you know, scared from that." Martin's hand was over her mouth, and he told her that he "already took care of [her] mother," which she understood to mean "[t]hat he hurt her or killed her." She apologized to Martin "over and over and over again so he would like stop what he was doing" and told him that he could stay. Afterwards, Martin fell asleep.

The following morning Martin woke up "enraged or in a bad mood"; "that person that he would turn into still was there." Something happened to upset Martin while they were in the bathroom, and he choked Ellington "up against" the wall. She felt "terror," and when he stopped, she told him "let's just have a good day. Let's have a good day, please just – we'll have a good day." She testified that such statements were the only way to "get him to calm down" and "talk him down off the ledge," "if [they] worked." When questioned whether she had asked Martin to leave the home, Ellington was equivocal, explaining, "I don't believe I told him that he had to leave. I mean, I told him he had to leave because he couldn't stay there anymore."

At some point, Larson came into the bathroom, and Larson and Ellington walked to the living room. Martin followed, and Ellington "started to try and like get away because

4

[she] thought he was . . . coming after [her]." She tried to "deter" him, but it did not work. Martin grabbed Ellington's hair and "started to jerk her head back and forth." There "was something else that happened," but she was "blank." Martin made Ellington and Larson sit on the couch, and they tried to calm him down. Ellington testified that she thinks Martin next ordered them into the bedroom. She could not recall specifically how he would not let them leave the room but believed it was "more verbal" and not a "physical act." Martin shut the door to the bedroom, and Ellington described his demeanor: he was "very angry and he's . . . that person that I didn't recognize again. I mean, . . . he was breathing heavy[,] and . . . he was very angry." Ellington started to "cry and sob," which angered Martin "even more." He took a thick glass off her dresser, in which she put pennies and things, and broke it on the dresser. He then ripped his shirt down the middle, wrapped it around his hand, grabbed a piece of glass, and etched a line into the glass top of a nearby vanity. Ellington testified that "it was just kind of implied that he was going to use that on us." She stated that she could not recall whether Martin made any statements while holding the glass, but later agreed that she told a detective at the time that Martin had said "he was going to cut [their] throats."

Both Ellington and Larson struggled frequently to recall certain facts and dates. Ellington testified that "at the time and right now, I – I feel like my memory has dissipated with a lot of this stuff. And that's the one thing I can't remember him saying." However, she also testified that she did not remember telling another officer "right after" the incident that Martin "came right at [her] with the glass," explaining, "I put a lot of it away for my own self-preservation." Nevertheless, she agreed that her memory would have been better when she made the statements to the officers and that she had no reason to deny making the statements.

5

While Ellington and Larson were confined in the bedroom, Larson "got up to say that she was going to go call the police," when Martin grabbed her and pushed her into a headboard or footboard of the bed. Ellington testified that Larson "kind of collapsed and then she wet her pants." When asked whether she felt free to leave, Ellington responded that she did not "[b]ecause it was implied. He had the door closed and I knew better." During that time, she feared for her and her mother's lives.

At that point, Luke came home, and Martin stated, "[G]et rid of him or I'll kill him." Larson went to answer the door, and Ellington instructed her to tell Luke to go away because she did not want him to be harmed. Larson had been gone for approximately five minutes when Martin became restless and told Ellington to go out and find out what was going on. She saw that Luke was walking back to his girlfriend's house and told Larson "we're leaving, follow me, let's go." They went to a neighbor's house and called the police.

After Ellington and Larson fled, Martin took Ellington's car and left the house. Eventually, he returned and was able to enter with Ellington's keys. Ellington was confused as to what happened next, stating that the incident in the bathroom "happened the next day when he came back." She then testified, "When he came in that night, he had keys to my throat that night. I don't know – that doesn't make sense because they're in the pictures [of the home's interior taken by BPD after Ellington and Larson called the police]. I don't know. I'm just –." Ellington testified that she did not think she and Martin resumed their relationship after the incident.

Over defense counsel's objections, the trial court permitted Ellington to testify in a limited manner about a fourth incident occurring approximately three weeks after the July 2017 break-in. Ellington testified that she drove Martin to Kerrville, Texas, because he needed a place

6

to stay, and she was going to try to get him to stay with his friends. While there, another assault involving choking or strangulation occurred, which, compared to the others, was the "worst one." At some point, Martin wanted Ellington to go somewhere with him, and she did not want to go. Still, she complied and went with him because of a threat he made. The following day, she met with someone from the Comal County District Attorney's Office to obtain a protective order against Martin. Lastly, Ellington testified that throughout the process, she had "wanted to do what [she] could to help [Martin] and indicated that [she] wanted to drop charges at various points."

On cross-examination, Ellington testified that Martin was staying at Larson's home at the time of the 2017 incident, was receiving his mail there, and had the right to be in the home. Ellington was confused as to why the case involved a charge of burglary of a habitation. She also testified that she had "indicated to [defense counsel] that [Martin] never actually made a threat or a movement or – either physical or spoken to [her] with the glass in his hand," contradicting her contemporaneously recorded statements to the police, which were admitted at trial. When asked whether it was true that Martin never exhibited the glass in a threatening manner or stated "that he was going to do something to [her] with the glass," Ellington replied, "That's what I remember." She agreed that it was possible that at the time, she had told officers "what [she] was thinking in [her] mind rather than what [she] actually perceived" Martin doing.

Larson, who was 81 years old at the time of trial, testified that during the July 2017 incident, she and Ellington "were in one of the rooms in the house and that was in there and we had a hard time trying to get out of there." Martin would stop them from going to the door, "pulling us back, whatever." When asked whether Martin had made threats against them, Larson responded, "I don't remember exactly how they were, but yes, he was saying some

7

pretty scary things." She testified that she was afraid Martin was going to hurt both of them and that was "as much as [she] can remember at this time." Asked if Martin put his hands on her, she stated, "Occasionally if I got close to the door, he would pull me back or – you know, at one time or another, yes." When asked whether Martin pushed her, she replied, "Just – well, just did the same thing when he was trying to keep us both in the room." However, she testified that when Martin was "doing that," she "wasn't in any pain at that time. No, just frightened." Questioned specifically as to whether she wet her pants, Larson stated, "I – I don't recall."

As with Ellington, Larson reported difficulties with her memory of the incident. She did not recall calling 911 despite a recording of the call being played in court. She did not recall Martin using a weapon or breaking anything in the room, stating, "Like I said, it's been a long time. I don't recall anything there." When asked whether she remembered some glass being involved, however, Larson testified, "I think there was a piece of broken glass in – in there, yes, if I remember correctly." While she could not recall how the glass had come to be in the room, she stated that she and Ellington "were a little afraid of what might happen . . . with that." When shown her contemporaneous statement to an officer, in which she stated that Martin had come after them with the glass, Larson testified, "See I don't – I don't recall that at that time. It's been quite some time." Larson read from her statement, "He threatened to kill me and my daughter two times on 7-13-17, broke a glass jar, and came after us with the glass." However, she clarified, "I recall it as a different situation."

Luke Ellington testified about the November 2016 incident and the prior incident in which Martin had slammed him to the ground. Luke testified that he had seen marks on his mom in the past, including black eyes, bruises on her arms, and red marks around her neck. The jury heard from Luke's ex-girlfriend; Kristopher Greenhill, a BPD officer who interviewed

8

Kristin and Luke after the November 2016 incident and responded to the July 2017 incident; and Margaret Bassett, an expert in domestic violence and abusive relationship dynamics, who testified to the characteristics of such relationships, common myths about them, and how trauma can affect memory. Specifically, Bassett testified that the brain goes into "survival mode" during a traumatic event, and, while it is possible that a victim of trauma may have no memory, victims generally remember "salient points," including that they have been sexually assaulted, as well as any threats.

During the charge conference, the defense, emphasizing Larson's testimony that she did not feel any pain, requested an instruction for the lesser-included offense of assault by offensive contact. Following a discussion, the State responded, "I can agree that we can submit a lesser on Count II. I mean, I'll agree to that because I think that's probably appropriate under the law." Although the trial court's ruling is absent from the record, at some point the court granted a directed verdict[2] with respect to Count II, injury to an elderly individual.[3]

The jury convicted Martin of burglary of a habitation with intent to commit a felony other than theft, two counts of aggravated kidnapping, aggravated assault with a deadly weapon, sexual assault, and assault family violence with a previous conviction. Consistent with the trial court's directed verdict, the jury acquitted Martin of injury to an elderly individual.

---

[2] The record before us contains no order from the trial court. Rather, the existence of the directed verdict was first made evident in the State's closing argument and the jury charge at the guilt-innocence phase of trial.

[3] There was seemingly confusion among the parties as to when the trial court's ruling occurred, as evidenced by the State's remark, "During this entire time that we've been sitting here, I was under the impression that we were proceeding with the lesser-included of assault by contact based on the defense's request."

Regarding Count V, alleging aggravated assault with a deadly weapon against Ellington, the jury convicted Martin of the lesser-included offense of assault by threat.

Following a hearing on punishment, the trial court sentenced Martin to five years for assault family violence, fifteen years for sexual assault, ten years for aggravated assault with a deadly weapon, sixty years for each count of aggravated kidnapping, and life imprisonment for burglary of a habitation, ordering that the sentences run concurrently. The court also assessed Martin a $500 fine for assault by threat.

## DISCUSSION

On appeal, Martin challenges (1) the constitutionality of Article 38.371 of the Texas Code of Criminal Procedure, (2) the admission of evidence concerning the Kerrville incident; (3) the admission of photographs from the November 2016 incident, and (4) the propriety of a statement during the State's closing argument concerning lesser-included offenses. The State, in a single issue on cross-appeal, alleges that the trial court erred in ordering a directed verdict of acquittal on the count of injury to an elderly individual.

## I.  Constitutionality of Article 38.371

In his first issue, Martin contends that Article 38.371[4] is facially unconstitutional[5] because it violates a defendant's right to be tried for one offense at a time and permits the State

---

[4]  Article 38.371 provides that in the prosecution of certain domestic violence offenses, each party may offer, subject to the Texas Rules of Evidence and other applicable law, "testimony or other evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense . . ., including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim." Tex. Code Crim. Proc. art. 38.371.

10

to introduce evidence of extraneous offenses that have not been subject to the "speedy trial" analysis in *Barker v. Wingo*, 407 U.S. 514, 530 (1972).**6**

"If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Tha Dang Nguyen v. State*, 359 S.W.3d 636, 645–46 (Tex. Crim. App. 2012) (quoting *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944)); *see Ex parte Salfen*, 618 S.W.2d 766, 770 (Tex. Crim. App. 1981) ("It is well-settled that the constitutionality of a statute will not be determined in any case unless such a determination is absolutely necessary to decide the case in which the issue is raised."); *City of San Antonio v. Summerglen Prop. Owners Ass'n*, 185 S.W.3d 74, 87 (Tex. App.—San Antonio 2005, pet. denied) ("[A] court will not rule on a constitutional question, although properly presented by the record, if there is some other ground upon which the case may be disposed.").

"A trial court abuses its discretion only when no reasonable view of the record could support its ruling.  A trial court's ruling will be upheld if it is correct on any applicable legal theory, even if the trial court articulated an invalid basis." *Briggs v. State*, 560 S.W.3d 176, 184 (Tex. Crim. App. 2018).  Because we conclude below that the challenged evidence in this case was admissible under Rules 403 and 404(b) of the Texas Rules of Evidence, we need address neither the admissibility of the evidence under article 38.371 nor the constitutionality of that

---

**5**  At trial, Martin challenged the constitutionality of Article 38.371 both on its face and "as applied."  While Martin in his brief argues that "[Article] 38.371 is facially unconstitutional," the argument is ambiguous and subject to interpretation as an "as applied" constitutional challenge.  Because we do not reach the merits of Martin's claim, we need not determine the nature of his constitutional claim.

**6**  Specifically, Martin argues that "Article 38.371 does not have any safeguards to prevent the use of charges that would not be allowable due to speedy trial violations."

statute. *See Felipe v. State*, No. 03-19-00508-CR, 2020 WL 3887974, at *3 n.4 (Tex. App.—Austin July 8, 2020, no pet.) (mem. op., not designated for publication) ("Given our ultimate determination that the evidence was admissible under the Rules of Evidence, we need not address whether the evidence was also admissible under former article 38.371 or whether Felipe preserved this complaint for appellate consideration."); *Williams v. State*, No. 01-15-00629-CR, 2016 WL 4055427, at *3 (Tex. App.—Houston [1st Dist.] July 28, 2016, pet. ref'd) (mem. op., not designated for publication) (holding that because defendant failed to show trial court did not properly admit evidence under Rule 404(b) or Article 37.07, he had not shown he was convicted as result of Article 38.37, and constitutional analysis of challenged statute would be prohibited declaratory judgment). We overrule Martin's first issue.

## II.    Admission of Subsequent Extraneous Offense

In his second issue, Martin contends that the trial court erred by admitting evidence of an extraneous offense that occurred after the indicted offenses and maintains that the evidence should have been excluded under Rules 403 and 404(b) of the Texas Rules of Evidence. At trial, Martin asserted that the extraneous offense, by taking place after the indicted offenses, did not "go to the state of mind as to the indicted offense" and that its prejudicial nature "far outweigh[ed]" its probative value.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *see also Dabney v. State*, 492 S.W.3d 309, 316 (Tex. Crim. App. 2016) ("[B]ecause trial courts are in the best position to decide admissibility questions, appellate courts must review a trial court's decision under an abuse-of-discretion standard."). An abuse of discretion does not occur unless the trial

court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). In other words, we may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see also Henley*, 493 S.W.3d at 83 ("Before a reviewing court may reverse the trial court's decision, 'it must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008))). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

The erroneous admission of evidence generally is considered non-constitutional error. *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007); *see also Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (explaining that erroneous admission of evidence was non-constitutional error). Non-constitutional error requires reversal only if it affects the substantial rights of the accused. Tex. R. App. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *see also* Tex. R. Evid. 103 (stating that trial court error admitting or excluding evidence must affect "substantial right of the party"). "An error does not affect substantial rights if the appellate court has 'a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect.'" *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021) (quoting *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018)). In deciding that question, we consider: (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the

13

evidence supporting the verdict; (3) the existence and degree of additional evidence supporting the verdict; and (4) whether the State emphasized the error. *Id*.

### Rule 404(b)

Rule 404(b) provides, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). The Rule, however, includes a clarification: "This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*. R. 404(b)(2). The listed exceptions in Rule 404(b) "are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343. Rule 404(b) is a rule of inclusion, not exclusion; it excludes only that evidence "that is offered (or will be used) solely for the purpose of proving bad character and hence conformity with that bad character." *Id*. The party offering the extraneous offense evidence "must be able to explain to the trial court, and to the opponent, the logical and legal rationales that support its admission on a basis other than 'bad character' or propensity purpose." *Id*.

"Rebuttal of a defensive theory is also one of the permissible purposes for which evidence may be admitted under Rule 404(b)." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see Crank v. State*, 761 S.W.2d 328, 341 (Tex. Crim. App. 1988) (observing that "probably the most common situation which gives rise to the admission of extraneous offenses is in rebuttal of a defensive theory"), *overruled on other grounds by Alford v. State*, 866 S.W.2d 619 (Tex. Crim. App. 1993). Evidence that is otherwise inadmissible becomes admissible when a party opens the door to such evidence. *Id*. A defendant may open the door to

14

extraneous-offense evidence by raising a defensive theory in voir dire, his opening statement, cross-examination, or his case-in-chief. *See Dabney*, 492 S.W.3d at 318 (voir dire and opening statement); *De La Paz*, 279 S.W.3d at 345–46 (case-in-chief); *Powell v. State*, 63 S.W.3d 435, 439 (Tex. Crim. App. 2001) (cross-examination); *see also Gullatt v. State*, 590 S.W.3d 20, 25 (Tex. App.—Texarkana 2019, pet. ref'd) ("Extraneous-offense evidence may be admitted to rebut a defensive theory raised in opening statement, cross-examination of State's witnesses, or the defense's case-in-chief.").

The fact that an extraneous offense occurred subsequent to the events underlying the indicted offenses does not render it inadmissible under Rule 404(b). "Rule 404 . . . contains no time limitation." *Prince v. State*, 192 S.W.3d 49, 55 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (citing *Templin v. State*, 711 S.W.2d 30, 34 (Tex. Crim. App. 1986)); *see Jamerson v. State*, No. 01-19-00796-CR, 2021 WL 1537516, at *6 (Tex. App.—Houston [1st Dist.] Apr. 20, 2021, no pet.) (mem. op., not designated for publication) ("We are not persuaded that the challenged evidence was inadmissible because it concerns an act subsequent to the charged offense. Neither article 38.371 nor Rule 404(b) contains any provision limiting their respective applicability to evidence of prior acts."). This Court and at least six of our sister courts have held that a trial court did not abuse its discretion by admitting evidence of a subsequent extraneous offense. *See Torres v. State*, 794 S.W.2d 596, 599 (Tex. App—Austin 1990, no pet.) (holding subsequent extraneous offense admissible under 404(b) pursuant to consciousness of guilt exception); *see also Williams v. State*, 290 S.W.3d 407, 411 (Tex. App.—Amarillo 2009, no pet.) (mem. op.) (upholding admission of subsequent, extraneous robbery to connect vehicle from robbery with vehicle from charged offense); *Prince*, 192 S.W.3d at 55 ("The fact that those offenses were committed ten years after the murder does not affect their admissibility on the

issue of intent. The extraneous acts were similar to the charged offense and were probative evidence that appellant intended to rob the convenience store."); *Mason v. State*, 99 S.W.3d 652, 656 (Tex. App.—Eastland 2003, pet. ref'd) ("We hold that the trial court did not abuse its discretion in finding that the extraneous offenses in 2001 were admissible as circumstantial evidence of appellant's knowing possession of cocaine in 1999."); *Russell v. State*, 113 S.W.3d 530, 537 (Tex. App.—Fort Worth 2003, pet. ref'd) ("[W]e hold that the trial court did not abuse its discretion by rejecting Russell's contention that the Vogt Street offense was not admissible simply because it occurred [five weeks] after the Fast Freddy's offense."); *Skeen v. State*, 96 S.W.3d 567, 576 (Tex. App.—Texarkana 2002, pet. ref'd) (evidence of arrest that occurred seventeen months after charged offense was admissible to prove lack of accident in prosecution for manslaughter).

On this record, the trial court did not abuse its discretion in overruling Martin's objection under Rule 404(b) to the admission of testimony concerning the Kerrville extraneous offense. During voir dire, defense counsel raised the defensive theories of intent, knowledge, accident, and mistake in a series of statements and questions to the panel. Foreshadowing Ellington's and Larson's testimony concerning Martin's use of a glass shard, defense counsel posed the following hypothetical:

> Aggravated assault, two ways you can do it. You can either call it serious bodily injury or you can use or exhibit a deadly weapon.
>
> . . .
>
> Okay. Let's say you and your brother get into a fight and y'all are in the living room and there's a gun sitting on top of a cabinet next to where you-all are squaring off against each other. One of you pushes the other one against the cabinet and the gun falls to the ground.
>
> Okay. Now, let's say one of y'all picks up the gun and puts it back on the

16

cabinet. Do you think that's exhibiting a deadly weapon? If they didn't point it at you, didn't – maybe like in a threatening thing? Like they were going to use the gun and pick it up and put it back on the cabinet, do you think that's exhibiting a deadly weapon in the commission of an assault?

With respect to the charged counts of aggravated kidnapping, defense counsel explained:

> [T]he first thing you have to determine is whether or not they intentionally or knowingly actually abducted the person.
>
> Don't just assume that that portion is there because that's – that's part of the trial is whether or not the person has intentionally or knowingly abducted before you start looking at whether they were terrorized or whatever. Okay. Understand that that – that the key thing on – before you even start looking at those elements is – is ask yourself, is the person intentionally or knowingly abducted. Okay?

Defense counsel's voir dire remarks opened the door to Ellington's testimony describing the Kerrville offense. As the State emphasized during the bench conference prior to the admission of the testimony: "So where I have to prove intentionally or knowingly assaulted someone and used or exhibited a deadly weapon and then intentionally abducted somebody through the use of deadly force, then a subsequent assault just three weeks later when he's trying to kill her is certainly relevant and probative." Ellington's testimony that within three weeks of the charged offenses, Martin once again choked and strangled her after forcing her to unwillingly accompany him by threat directly rebuts the defensive theories raised in voir dire by tending to prove Martin's intent, knowledge, absence of mistake, and lack of accident with respect to his conduct during the July 2017 offenses. The conduct alleged in the extraneous offense is similar to that underlying the indicted offenses and was admissible for purposes other than to prove Martin's character. That the Kerrville incident occurred after the indicted offenses does not preclude its admissibility under Rule 404(b). *See, e.g.*, *Torres*, 794 S.W.2d at 599. Accordingly,

17

because it was not outside the zone of reasonable disagreement for the trial court to find that the testimony was admissible under Rule 404(b), we conclude that the trial court did not abuse its discretion by admitting it.

Even were we to conclude that the trial court erred in admitting the testimony, we are unable to say that Ellington was harmed by its admission. Martin argues that the "harm is clear" because Ellington testified that the Kerrville incident was the "worst one" "[c]ompared to the other assaults that [she] discussed." As such, the jury was "allowed to hear evidence of an unindicted matter that was worse than the charged offenses."

However, although Ellington testified that the Kerrville incident was the "worst," her testimony concerning the facts of the assault was strictly circumscribed by the trial court. The trial record consists of approximately 234 pages, of which seventeen lines pertain to the challenged testimony:

Q. In Kerrville was there an assault that took place?

A. Yes, there was.

Q. And did that assault include choking or strangulation?

A. Yes, it did.

Q. Compared to the other assaults that you discussed, would you consider this to be the worst one?

A. Yes.

Q. Was there a point where he wanted you to go with him somewhere and you did not want to go?

A. Yes.

Q. Did you comply, though, and go with him?

A. I did.

Q. And was that because a threat was made by [Martin]?

A. Yes.

The State did not reference the Kerrville incident for the remainder of the trial, including in its closing argument, other than to note, "I want you to think about the context of the relationship . . . . He actually used deadly force by strangling her repeatedly."

At a bench conference prior to Ellington's testimony, the trial court forbade the State from eliciting testimony that Martin grabbed Ellington by the arm and dragged her across a porch, during which she began crying because "her arm hurt . . . really bad." Similarly, the State was not permitted to question Ellington about Martin's striking her in the face with a closed fist; his threat to bash in her head with a rock he was holding if she did not get into a car with him; or her statement, "[T]his incident lasted the longest. And I really and truly thought that if it had just been a few more minutes, I don't know if I would have made it."

By contrast, the remainder of the evidence introduced at trial was extensive and strongly probative of the charged offenses. Ellington testified that during the July 2017 incident underlying the indictment, Martin forced her to perform oral sex by threatening that if she did not, "tomorrow would be a bad day." She testified that the next night, she woke up to Martin standing over her, pressing "something sharp" against her neck, and covering her mouth with his other hand. He told her that he "already took care of [her] mother." The following morning, he choked her against a wall in the bathroom, and she attempted to defuse the situation by begging him to "have a good day." Later, he grabbed her by the hair and jerked her head back and forth before forcing her and her mother into a bedroom, closing the door, and not allowing them to leave. Next, he shattered a thick glass jar, ripped off his shirt, and scratched a line in the top of a vanity. When Larson attempted to leave the room to call the police, Martin grabbed her and

19

threw her into the headboard or footboard of the bed, causing her to collapse and wet her pants. When Ellington's son came home, Martin ordered her to "get rid of him or I will kill him."

Larson agreed that she and Ellington were confined to the bedroom and that Martin would pull them back whenever they went to the door. She testified that he was saying "some pretty scary things," and she was afraid he was going to hurt them. She also testified that she and Ellington were afraid of what might happen with the broken piece of glass because Martin was saying "some threatening things."

Referencing lapses in their respective memories at trial, both Ellington and Larson conceded that their contemporaneous recollections would have been more accurate. Both made written statements to police shortly after the incident, which were admitted into evidence, as was a recording of Larson's 911 call from the neighbor's house. In her written statement, Ellington explained that after she had texted Martin not to come back to the house:

> He broke in late that evening and woke me up with a knife to my throat and covered my mouth with his hand. He then stopped after I begged him to stop and went to sleep. Today he woke up angry and then started to pull my hair and head back and forth. Then slapped me in the head several times then pushed my mother and held us hostage for several hours threatening to kill us both. He at one point [b]roke a glass and threatened to cut our throats – only after begging him did he stop.

Larson similarly wrote, "We sent [Martin] out 7/12/17 and told him not to return. He returned later and broke into the house about 1-2 A.M. He threatened to kill me and my daughter 2 times 7/13/17 – broke a glass jar and came after us with the glass." In the recording of the 911 call, Larson can be heard telling the operator, "We have a hostage-type problem . . . . It was my daughter and I, and the man that was keeping us hostage [indistinct] kill us both." She

20

noted that they had "had trouble with him off and on," and they were held hostage previously "[l]ast November."

In addition, "error is harmless if very similar evidence is admitted without objection." *Gutierrez v. State*, 585 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (citing *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010); *Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998)). At trial, Martin did not object to Ellington's testimony about the November 2016 assault, an account that was considerably more detailed and descriptive than the testimony about the Kerrville incident, undermining the defense's purported justification that the latter was harmful because it was "worse than the charged offenses."

Ellington testified that during the November 2016 incident Martin kept her from leaving a room even though she was hyperventilating, and blocked the door with a chair or table. He then choked her "a couple of times" "to the point where [she] was not coherent of what was going on around [her]." She felt "death" while his hands were around her throat and testified that she prayed that it wouldn't last long enough "to do something to [her] where [she] wouldn't be able to come back from." Her hearing "dissipated," and she "checked out" and felt like she had "missed time." When her son tried to stop the assault, Martin placed him in a chokehold and slammed his head on the ground.

Accordingly, even assuming that the trial court erred by admitting the evidence, we would be unable to conclude that the admission of Ellington's testimony harmed Martin under the *Gonzalez* factors in light of the record. *See Gonzalez*, 544 S.W.3d at 373.

*Rule 403*

Rule 403 allows for the exclusion of relevant evidence when its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). "The probative force of evidence refers to how strongly it serves to make the existence of a fact of consequence more or less probable." *Gonzalez*, 544 S.W.3d at 372; *accord Davis*, 329 S.W.3d at 806.

The fact that evidence shows the defendant in a negative light is insufficient to justify its exclusion under Rule 403. *See Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021). "Almost all evidence offered by the prosecution will be prejudicial to the defendant. Only evidence that is *unfairly* prejudicial should be excluded." *DeLeon v. State*, 77 S.W.3d 300, 315 (Tex. App.—Austin 2001, pet. ref'd). "Unfair prejudice is the 'tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Inthalangsy*, 634 S.W.3d at 758 (quoting *Montgomery*, 810 S.W.2d at 389). It is only when there exists "a clear disparity between the degree of prejudice produced by the offered evidence and its probative value that Rule 403 is applicable." *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012); *see Johnson*, 490 S.W.3d at 911 ("Under Rule 403, the danger of unfair prejudice must *substantially* outweigh the probative value.").

In conducting a Rule 403 analysis, the trial court must balance the claimed probative force of the proffered evidence along with the proponent's need for the evidence against:

> (1) any tendency of the evidence to suggest that the case would be decided on an improper basis; (2) any tendency of the evidence to confuse or distract the jury from the main issues; (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Henley*, 493 S.W.3d at 93 (citing *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)). These factors may blend together in practice. *Gigliobianco*, 210 S.W.3d at 642.

"Confusion of the issues" refers to a tendency to confuse or distract the jury from the main issues of the case; evidence that "consumes an inordinate amount of time to present or answer" might confuse or distract the jury from the main issues. *Casey v. State*, 215 S.W.3d 878, 880 (Tex. Crim. App. 2007) (citing *Gigliobianco*, 210 S.W.3d at 641). "Misleading the jury" refers to evidence's tendency to be given undue weight by the jury on other than emotional grounds. *Id.*; *see Wiley v. State*, 74 S.W.3d 399, 407 n.21 (Tex. Crim. App. 2002) (explaining that danger of "confusion of the issues" and "misleading the jury," as basis for excluding evidence, "arises when circumstantial evidence tends to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue in the current case"; "[i]n short, the evidence is a 'rabbit trail'"). "Undue delay" and "needless presentation of cumulative evidence" concern the efficiency of the proceeding rather than the threat of an inaccurate decision. *Casey*, 215 S.W.3d at 880. In evaluating the State's need for the evidence, we look "at whether the fact related to a disputed issue and whether the State had other evidence establishing that fact." *Gonzalez*, 544 S.W.3d at 372; *State v. Mechler*, 153 S.W.3d 435, 441 (Tex. Crim. App. 2005).

23

As discussed above, Ellington's testimony concerning the Kerrville incident was highly relevant and probative in rebutting the defensive theories of intent, knowledge, accident, and mistake. While evidence of additional extraneous offenses was presented to the jury, Ellington's testimony was the only evidence addressing the Kerrville incident, which in turn was the only extraneous offense to have occurred after the indicted offenses.

Although several characteristics of the Kerrville incident were similar to those of the other extraneous offenses, each act independently and cumulatively added to the jury's grasp of the relationship and pattern of abuse. What is more, the Kerrville incident was uniquely relevant in facilitating the jury's understanding of Bassett's testimony, specifically as it related to strangulation as a form of abuse and myths such as that victims always leave abusive relationships or fight back. Lastly, because the incident occurred after the charged offenses, it demonstrates Martin's intent, knowledge, and lack of mistake and accident in a particularly pronounced way, insomuch as it tends to show that the abuse continued despite the severity of the charged offenses and the involvement of law enforcement. For these reasons, we cannot conclude that the evidence was unnecessary or unduly repetitive.

As noted above, the testimony was exceedingly brief, accounting for less than a page of the 234-page trial record, and therefore did not consume an inordinate amount of time. What is more, the Kerrville incident was not referenced again in testimony.

We have rejected Martin's argument that the evidence pertaining to the Kerrville incident was especially inflammatory. We are similarly unpersuaded by his arguments, advanced at trial, that testimony about the incident caused the jury to decide the case upon an improper basis, distracting the jury from the indicted offenses or causing the jury to improperly conflate the Kerrville incident with that of July 2017. Nothing in the record suggests that the

24

jury was susceptible to such an error or that the challenged testimony made such an error more likely.

Additionally, the trial court's grant of the defense's requested limiting instruction goes some way toward alleviating concerns that the jury was distracted, confused, or decided the case on an improper basis. The trial court instructed the jury:

> Ladies and gentlemen, any defendant is entitled to be tried solely upon the allegations contained in the indictment. And if there is evidence admitted before you regarding any other or extraneous acts, first of all, you may not consider any such acts for any purpose until you as an individual find and believe that the defendant, if at all, committed such acts beyond a – or you believe that beyond a reasonable doubt, number one.
>
> Number two, evidence of any such crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character. However, such evidence, if any, may be admissible to prove, if it does or if it does not, but motive, intent, preparation, plan, knowledge, absence of mistake or lack of accident, you may consider any such evidence, if at all, only for those purposes.

The court's instruction helps alleviate any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate its probative force or to be considered for an improper purpose. We have previously looked favorably upon a similar instruction in addressing many of the concerns espoused by Martin here. In *Hodge v. State*, 500 S.W.3d 612, 626 n.9 (Tex. App.—Austin 2016, no pet.), we explained:

> To the extent that Hodge is asserting in his brief that members of the jury could have determined that Hodge committed one or more of the alleged counts by relying on evidence of the offenses occurring in Lampasas County or Wyoming, we note that the jury charge contained an extraneous-offense instruction explaining that the jury could not consider that type of evidence unless the jury determined beyond a reasonable doubt that Hodge committed the extraneous offenses and then "may only consider" the evidence "for the purpose of determining any relevant matters," including the state of mind of Hodge and the alleged victims, "the previous and subsequent relationship between" Hodge and

25

the victims, and "the character of the defendant and acts performed in conformity with" Hodge's character. Moreover, the jury charges also specified that Hodge was "on trial solely on the charges contained in the indictment."

We presume that juries follow the trial court's instructions in the manner presented. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). For these reasons, we conclude that the probative value of Ellington's testimony was not substantially outweighed by the dangers enumerated in Rule 403.

### III. Photographic Evidence of November 2016 Extraneous Offense

In his third issue, Martin contends that the trial court erred by admitting into evidence photographs from the November 2016 extraneous offense in violation of Rules 403 and 404(b). However, any error in the admission of the photographs was rendered harmless when Martin failed to object at trial to Ellington's testimony regarding the offense and photographs.

"[O]verruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *see Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991) ("[I]t is well settled that an error in admission of evidence is cured where the same evidence comes in elsewhere without objection; defense counsel must object every time allegedly inadmissible evidence is offered."); *Sandoval v. State*, 409 S.W.3d 259, 289 (Tex. App.—Austin 2013, no pet.) ("[E]rror in the admission of evidence *may* be rendered harmless when substantially the same evidence is admitted elsewhere without objection."). This is so even when the format of the evidence differs, so long as its content is the same. *Moore v. State*, 999 S.W.2d 385, 402 (Tex. Crim. App. 1999) (holding objection was waived where appellant objected to admission of diagram, contents of which were established by testimony of

witnesses); *see Mallory v. State*, No. 02-17-00279-CR, 2019 WL 618893, at *12 (Tex. App.—Fort Worth Feb. 14, 2019, pet. ref'd) (mem. op., not designated for publication) (holding defendant forfeited challenges to photographs by failing to object to testimony about their contents); *Sampson v. State*, No. 02-15-00202-CR, 2016 WL 4474339, at *3 (Tex. App.—Fort Worth Aug. 25, 2016, pet. ref'd) (mem. op., not designated for publication) (holding any error in admission of photographs was harmless due to admission of unobjected-to testimony regarding contents of photographs). The evidence need not be identical but must involve "substantially the same facts." *Hitt v. State*, 53 S.W.3d 697, 708 (Tex. App.—Austin 2001, pet. ref'd); *see Estrada*, 313 S.W.3d at 302 n.29 (noting that any error was harmless when "very similar" evidence was admitted without objection).

Here, Ellington testified without objection that on November 4, 2016, Martin became violent with her and choked her multiple times by putting his hands around her neck. The assault began on the bed but continued when she fell to the floor. When the State attempted to offer three photographs taken by BPD depicting how she appeared after the assault, defense counsel stated, "Subject to previous objections, Your Honor." The trial judge called the parties to the bench to clarify the objection, and defense counsel elaborated:

> [T]hey're not from the – the indicted case. They're from a previous indictment. And just subject to the argument that they haven't been subjected to a 403 or 404 (b) analysis to determine admissibility under the *Gigliobianco* factors to determine what purpose the – they're coming in under 404(b).

The trial court overruled the objection and admitted the photographs. They were published to the jury, and Ellington testified as to their contents:

> Q. . . . Okay. Kristin, we're looking at State's Exhibit 2. Can you tell me what is on the side of your face that they were trying to capture?

27

A. A red mark.

Q. Okay. And then State's Exhibit 3, what happened – what are they taking a picture of there?

A. My lip was busted on – on the inside.

Q. Okay. And State's Exhibit 4, what are we looking at there?

A. I believe where he put his hands on my neck.

Martin did not object to this testimony. As a result, he forfeited any objection to the admission of the photographs on appeal, and any error caused by their admission is harmless. We overrule Martin's third issue.

## IV. Improper Closing Argument

In his fourth issue, Martin contends that the State made an improper jury argument during closing, when the prosecution stated:

> So the defendant in this case is charged with eight counts, eight different crimes. And I'm going to go through those. There are two lesser-included offenses included in this jury charge.
>
> So when the lesser-included charge is put in here, it doesn't mean that anyone in this courtroom believes that there's not enough evidence to convict on the primary charge. All it means is that someone – anyone requested it and it was put there.
>
> Okay. So the Judge doesn't believe, the defense attorney doesn't believe and we don't believe, that it doesn't necessarily mean that we don't believe that there's enough of a primary offense, that it makes sense.

On appeal, Martin argues that the State's remarks "improperly suggested that the Trial Court and Defense Counsel believe that there is sufficient evidence to convict on the primary charge."

"Appropriate jury argument generally falls within only four areas: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to argument of

opposing counsel; and (4) a plea for law enforcement." *Ex parte Scott*, 541 S.W.3d 104, 119 (Tex. Crim. App. 2017). However, "[t]he right to a trial untainted by improper jury argument is forfeitable." *Hernandez v. State*, 538 S.W.3d 619, 622–23 (Tex. Crim. App. 2018). "To preserve a complaint about improper jury argument for appellate review, a defendant must object and pursue the objection to an adverse ruling. A defendant must object at the earliest opportunity to prevent waiver of an issue on appeal." *Owens v. State*, 549 S.W.3d 735, 744 (Tex. App.—Austin 2017, pet. ref'd); *see Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) ("To preserve error in prosecutorial argument, a defendant must pursue to an adverse ruling his objections to jury argument.").

Martin failed to object to the State's argument at closing and has therefore failed to preserve error with respect to this claim. We overrule his fourth issue.

## V. Directed Verdict

In a single issue on cross-appeal, the State contends that the trial court erred in ordering a directed verdict of acquittal on Count II, injury to an elderly individual. We lack jurisdiction to consider the State's claim.

"One of the most fundamental rules of double-jeopardy jurisprudence is that when a trial ends in an acquittal, the defendant may not be tried again for the same offense." *State v. Blackshere*, 344 S.W.3d 400, 406 (Tex. Crim. App. 2011). An acquittal bars appellate review even when based "on an 'egregiously erroneous foundation,' such as erroneous exclusion of evidence or erroneous weighing of evidence." *Id*. (quoting *Fong Foo v. United States*, 369 U.S. 141, 143 (1962)); *see* Tex. Code Crim. Proc. art. 1.11 ("An acquittal of the defendant exempts him from a second trial or a second prosecution for the same offense, however irregular

the proceedings may have been."). "Two requirements must be met before double-jeopardy protections are implicated": (1) jeopardy must have attached[7] and (2) the State's appeal must threaten the defendant with an impermissible successive trial. *State v. Moreno*, 294 S.W.3d 594, 597 (Tex. Crim. App. 2009). "A defendant is acquitted when 'the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.'" *Id*. at 598 (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977)).

A directed verdict of acquittal, even when erroneous, constitutes an acquittal for double jeopardy purposes. *See id*. ("[W]hen a trial ends, after jeopardy has attached, with a judgment of acquittal, 'whether based on a jury verdict of not guilty *or on a ruling by the court that the evidence is insufficient to convict*,' any further prosecution, including an appeal, is prohibited by the Double Jeopardy Clause." (quoting *United States v. Scott*, 437 U.S. 82, 91 (1978))) (emphasis added). As the Court of Criminal Appeals explained in *Blackshere*:

> [T]here is little doubt that the trial court did not intend to acquit the appellee, in such terms. In fact, the parties and the trial court explicitly discussed avoiding the term "directed verdict of acquittal" in order to preserve the State's ability to appeal. But the intent and form of the trial court's actions cannot trump the substance of the protections afforded by the Double Jeopardy Clause.

344 S.W.3d at 408.

Because the trial court's directed verdict—by determining that the evidence at trial was insufficient to prove the elements of the offense—acquitted Martin of injury to an elderly individual, the Double Jeopardy Clause prevents us from reviewing the court's action. We therefore dismiss the State's issue on cross-appeal.

---

[7] In a state trial, jeopardy attaches when the jury is empaneled and sworn. *State v. Moreno*, 294 S.W.3d 594, 597 (Tex. Crim. App. 2009).

**CONCLUSION**

Having overruled each of Martin's issues and dismissed the State's issue on cross-appeal, we affirm the judgments of conviction and acquittal.

_____

Edward Smith, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed:   February 17, 2022

Do Not Publish